**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEX WALTON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 1:20-cv-06563 |
| NOBLE ENERGY, INC., DAVID L. STOVER, JEFFREY L. BERENSON, JAMES E. CRADDOCK, BARBARA J. DUGANIER, THOMAS J. EDELMAN, HOLLI C. LADHANI, SCOTT D. URBAN, WILLIAM T. VAN KLEEF and MARTHA B. WYRSCH, | ) ) ) ) ) ) ) ) ) ) **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) |

Plaintiff Alex Walton ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Noble Energy, Inc. ("Noble" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Noble, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Noble and Chevron Corporation ("Chevron").

2.     On July 20, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to

receive 0.1191 shares of Chevron for each share of Noble stock they own (the "Merger Consideration"). Upon completion of the merger, Noble shareholders will own approximately 3% and Chevron shareholders will own approximately 97% of the combined company.

3.      On August 11, 2020, in order to convince Noble shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading preliminary S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Noble shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Noble's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.     It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Noble shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the NASDAQ Composite, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Noble common stock.

12.     Defendant Noble is incorporated in Delaware and maintains its principal executive offices at 1001 Noble Energy Way, Houston, Texas 77070. The Company's common stock trades on the NASDAQ under the ticker symbol "NBL."

13.     Individual Defendant David L. Stover is Noble's Chief Executive Officer and Chairman and has been a director of Noble at all relevant times.

14.     Individual Defendant Jeffrey L. Berenson has been a director of Noble at all relevant times.

15.     Individual Defendant James E. Craddock has been a director of Noble at all relevant times.

16.     Individual Defendant Barbara J. Duganier has been a director of Noble at all relevant times.

17.     Individual Defendant Thomas J. Edelman has been a director of Noble at all relevant times.

18.     Individual Defendant Holli C. Ladhani has been a director of Noble at all relevant times.

19.     Individual Defendant Scott D. Urban has been a director of Noble at all relevant times.

20.     Individual Defendant William T. Van Kleef has been a director of Noble at all relevant times.

21. Individual Defendant Martha B. Wyrsch has been a director of Noble at all relevant times.

22. The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Noble (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of August 7, 2020, there were approximately 499,000,000 shares of Noble common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Noble will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i) whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    The Proposed Transaction

25.    Noble is an independent crude oil and natural gas exploration and production company that owns a portfolio of assets that are diversified through the U.S. and the World dealing with crude oil, NGLs and natural gas.

26.    On July 20, 2020, Noble and Chevron issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> SAN RAMON, Calif.--(BUSINESS WIRE)--Chevron Corporation (NYSE: CVX) announced today that it has entered into a definitive agreement with Noble Energy, Inc. (NASDAQ: NBL) to acquire all of the outstanding shares of Noble Energy in an all-stock transaction valued at $5 billion, or $10.38 per share. Based on Chevron's closing price on July 17, 2020 and under the terms of the agreement, Noble Energy shareholders will receive 0.1191 shares of Chevron for each Noble Energy share. The total enterprise value, including debt, of the transaction is $13 billion.
>
> The acquisition of Noble Energy provides Chevron with low-cost, proved reserves and attractive undeveloped resources that will enhance an already advantaged upstream portfolio. Noble Energy brings low-capital, cash-generating offshore assets in Israel, strengthening Chevron's position in the Eastern Mediterranean. Noble Energy also enhances Chevron's leading U.S. unconventional position with de-risked acreage in the DJ Basin and 92,000 largely contiguous and adjacent acres in the Permian Basin.
>
> "Our strong balance sheet and financial discipline gives us the flexibility to be a buyer of quality assets during these challenging times," said Chevron Chairman and CEO Michael Wirth. "This is a cost-effective opportunity for Chevron to acquire additional proved reserves and resources. Noble Energy's multi-asset, high-quality portfolio will enhance geographic diversity, increase capital flexibility, and improve our ability to generate strong cash flow. These assets play to Chevron's operational strengths, and the transaction underscores our commitment to capital discipline. We look forward to welcoming the Noble Energy team and shareholders to bring together the best of our organizations."
>
> "This combination is expected to unlock value for shareholders, generating anticipated annual run-rate cost synergies of approximately $300 million before tax, and it is expected to be accretive to free cash flow, earnings, and book returns one year after close," Wirth concluded.
>
> "The combination with Chevron is a compelling opportunity to join an admired

global, diversified energy leader with a top-tier balance sheet and strong shareholder returns," said David Stover, Noble Energy's Chairman and CEO. "Over the last few years, we have made significant progress executing our strategic objectives, including driving capital efficiency gains onshore, advancing our offshore conventional gas developments and significantly reducing our cost structure. As we looked to build on this positive momentum, the Noble Energy Board of Directors and management team conducted a thorough process and concluded that this transaction is the best way to maximize value for all Noble Energy shareholders. We look forward to bringing together our highly complementary cultures and teams to realize the long-term value and benefits that this combination will deliver."

**Transaction Benefits**

- **Low Cost Acquisition of Proved Reserves and Attractive Undeveloped Resource:** Based on Noble Energy's proved reserves at year-end 2019, this will add approximately 18 percent to Chevron's year-end 2019 proved oil and gas reserves at an average acquisition cost of less than $5/boe, and almost 7 billion barrels of risked resource for less than $1.50/boe.
- **Strong Strategic Fit**: Noble Energy's assets will enhance Chevron's portfolio in:
  - U.S. onshore
    - DJ Basin – New unconventional position with competitive returns that can be further developed leveraging Chevron's proven factory-model approach.
    - Permian Basin – Complementary acreage that enhances Chevron's strong position in the Delaware Basin.
    - Other -– An integrated midstream business and an established position in the Eagle Ford.
  - International
    - Israel – Large-scale, producing Eastern Mediterranean position that diversifies Chevron's portfolio and is expected to generate strong returns and cash flow with low capital requirements.
    - West Africa – Strong position in Equatorial Guinea with further growth opportunities.
- **Attractive Synergies:** The transaction is expected to achieve run-rate operating and other cost synergies of $300 million before-tax within a year of closing.
- **Accretive to Return on Capital Employed, Free Cash Flow, and EPS:** Chevron anticipates the transaction to be accretive to ROCE, free cash flow and earnings per share one year after closing, at $40 Brent.

**Transaction Details**

The acquisition consideration is structured with 100 percent stock utilizing

Chevron's attractive equity currency while maintaining a strong balance sheet. In aggregate, upon closing of the transaction, Chevron will issue approximately 58 million shares of stock. Total enterprise value of $13 billion includes net debt and book value of non-controlling interest.

The transaction has been unanimously approved by the Boards of Directors of both companies and is expected to close in the fourth quarter of 2020. The acquisition is subject to Noble Energy shareholder approval. It is also subject to regulatory approvals and other customary closing conditions.

The transaction price represents a premium of nearly 12% on a 10-day average based on closing stock prices on July 17, 2020. Following closing of the transaction, Noble Energy shareholders will own approximately 3% of the combined company.

**Advisors**

Credit Suisse Securities (USA) LLC is acting as financial advisor to Chevron. Paul, Weiss, Rifkind, Wharton & Garrison LLP is acting as legal advisor to Chevron. J.P. Morgan Securities LLC is acting as financial advisor to Noble Energy. Vinson & Elkins LLP is acting as legal advisor to Noble Energy.

**Conference Call**

Chevron will conduct a conference call on Monday, July 20, 2020, at 8:00 a.m. ET to discuss the transaction.

A webcast of the discussion will be available in a listen-only mode to individual investors, media, and other interested parties on Chevron's website at www.chevron.com under the "Investors" section, or by calling (833) 674-0417 and providing the conference ID 8393646. Additional materials will be available under "Events and Presentations" in the "Investors" section on the Chevron website.

Note for media: Chevron B-roll footage is available at https://chevron.co/broll

**About Chevron**

Chevron Corporation is one of the world's leading integrated energy companies. Through its subsidiaries that conduct business worldwide, the company is involved in virtually every facet of the energy industry. Chevron explores for, produces and transports crude oil and natural gas; refines, markets and distributes transportation fuels and lubricants; manufactures and sells petrochemicals and additives; generates power; and develops and deploys technologies that enhance business value in every aspect of the company's operations. Chevron is based in San Ramon, Calif. More information about Chevron is available at www.chevron.com.

**About Noble Energy**

Noble Energy is an independent oil and natural gas exploration and production company committed to meeting the world's growing energy needs and delivering leading returns to shareholders. The Company operates a high-quality portfolio of assets onshore in the United States and offshore in the Eastern Mediterranean and off the west coast of Africa. Founded more than 85 years ago, Noble Energy is guided by its values, its commitment to safety, and respect for stakeholders, communities and the environment. For more information on how the Company fulfills its purpose: Energizing the World, Bettering People's Lives®, visit www.nblenergy.com.

27.     Noble is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading S-4

29.     On August 11, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed

decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materiality of Financial Projections

30.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses that "[i]n connection with the Noble Energy Board's consideration of the transaction, Noble Energy's management prepared certain unaudited financial projections regarding Noble Energy's future performance for the years 2020 through 2029 on a standalone basis without giving effect to the merger (the 'Noble Energy management forecast'), and provided the Noble Energy management forecast to the Noble Energy Board and to Noble Energy's financial advisor for its use in connection with its financial analyses[.]" S-4 71-72.

31.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to

assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

33.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.     Here, Noble's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it. S-4 60-62.

35.     As discussed further below, the non-GAAP financial projections used do not provide Noble's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

36.     The S-4 discloses that "[i]n connection with the Noble Energy Board's consideration of the transaction, Noble Energy's management prepared certain unaudited financial projections regarding Noble Energy's future performance for the years 2020 through 2029 on a standalone basis without giving effect to the merger (the 'Noble Energy management forecast'), and provided the Noble Energy management forecast to the Noble Energy Board and to Noble Energy's financial advisor for its use in connection with its financial analyses[.]" *Id.* at 71-72.

37.     The S-4 goes on to disclose, *inter alia*, Noble's forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2029 for (1) EBITDAX and (2) Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 75.

38.     The S-4 defines EBITDAX as "net income (loss) before interest expense; income taxes; depreciation, depletion and amortization; exploration expenses; asset impairments; and loss (gain) on commodity derivative instruments, net of cash settlements in 2020." *Id.* at 75 n.1. Nevertheless, the S-4 fails to reconcile EBITDAX to its most comparable GAAP measure or disclose the line items used to calculate EBITDAX, rendering the S-4 materially false and/or misleading. *Id.* at 75.

39.     The S-4 defines Free Cash Flow as "cash flow from operations before working capital, less consolidated capital investments." *Id.* at 75 n.3. Nevertheless, the S-4 fails to reconcile Free Cash Flow to its most comparable GAAP measure or disclose the line items used to calculate Free Cash Flow, rendering the S-4 materially false and/or misleading. *Id.* at 75.

40.     Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.     The non-GAAP financial projections disclosed on pages 75 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

42.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

***The Financial Projections Violate Regulation G***

43.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

44.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Noble included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and

---

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance (June 24, 2016), *available at*   https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

46.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm. *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures. Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename1.pdf. *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the

47.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

48.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above.

50.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

51.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 75, Defendants must provide a reconciliation

---

reconciliation   required   under   Rule   100(a)   of   Regulation   G"),   *available   at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.     The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Aug. 17, 2020).

table of the non-GAAP financial measures to the most comparable GAAP measures and the calculated values for the combined company's pro forma Adjusted EBITDA and Unlevered Free Cash Flow.

### *The Materially Misleading Financial Analyses*

52.     The summary of the valuation methodologies utilized by J.P. Morgan, including the utilization of certain of the non-GAAP financial projections described above by J.P. Morgan, in connection with its valuation analyses (S-4 65) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

53.     With respect to J.P. Morgan's fairness opinion generally, the S-4 fails to disclose any financial analysis of Chevron. This is materially misleading because 100% of the Merger Consideration consists of Chevron stock, and without any analysis, shareholders can't assess the desirability of Chevron stock and therefore cannot fully determine the fairness of the Merger Consideration.

54.     With respect to J.P. Morgan's *Selected Transaction Multiples Analysis*, the S-4 fails to disclose the transaction value as a multiple of EBITDAX over the next twelve months for the 13 selected transactions. *Id.* at 68.

55.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the S-4 discloses that J.P. Morgan performed a discounted cash flow analysis on Noble by first calculating the present value of the unlevered free cash flows that Noble was expected to generate using the Base, Strip+, Strip+Low and Upside cases disclosed in the management projections. *Id.* at 69. J.P. Morgan then calculated a range of terminal values by applying a terminal value growth rate ranging

from (1.5%) to 1.5% of the unlevered free cash flow Noble was expected to generate in the terminal year. The unlevered free cash flows and terminal values were discounted using a discount rate range of 10% to 12%, which was based on Noble's weighted average cost of capital, and then divided by number of fully diluted Noble shares outstanding. *Id.* J.P. Morgan then assigned probability weights to each of the cases that reflected management's estimates with respect to the probability of each case happening to calculate the implied equity value range. *Id.* at 69-70.

56.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the S-4 fails to disclose: (1) whether the unlevered free cash flows used by J.P. Morgan are the same Free Cash Flows disclosed in the management projections, and if they are not, disclose how the unlevered free cash flow was calculated and the calculated values; (2) the calculated terminal values; (3) the inputs used to calculate the Company's weighted average cost of capital; (4) whether any enterprise adjustments were made; (5) how stock based compensation was treated (as a cash or non-cash expense); or (6) the number of fully diluted Noble shares outstanding.

57.     Since information was omitted, shareholders are unable to discern the veracity of J.P. Morgan's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare J.P. Morgan's calculations with the Company's financial projections.  The absence of any single piece of the above information renders J.P. Morgan's discounted cash flow analyses incomplete and misleading.   Thus, the Company's shareholders are being materially misled regarding the value of the Company.

58.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation."

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (Aug. 2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

59.     Therefore, in order for Noble shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

60.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from Noble shareholders.

61.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

62.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders

(i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

63. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

65. As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

66. The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

67.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

70.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

71.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial

projections for the Company.

72.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

73.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

74.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

75.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

76.     Noble is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

77.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

78.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of Noble within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Noble, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

81.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4.

83.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

84.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

85.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 18, 2020

Respectfully submitted,

By: *James M. Wilson, Jr.*
Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Alex Walton ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Noble Energy, Inc. ("Noble") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Noble securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 17th day of August, 2020.

_____
Alex Walton

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 04/15/19 | 350 |
|  |  |  |
|  |  |  |